# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>THE PERSON OF MESHACH SAMUELS, ALSO KNOWN AS ("AKA") "MESHACK SAMUELS," AKA "MESHAC SAMUELS," AKA "SHOOTASWISH95_" | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  2:22-MJ-01141 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 922(g), 1343, 1344, 1029, and 1028A | Conspiracy, Felon in Possession of a Firearm, Wire Fraud, Bank Fraud, Access Device Fraud and Aggravated Identity Theft |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Alfredo Rossi
_____
*Applicant's  signature*

Alfredo Rossi, Homeland Security Investigations, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's  signature*

City and state: Los Angeles, CA
Hon. John E. McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Rachel N. Agress (x0487)

## ATTACHMENT A-3

PERSON TO BE SEARCHED

The person of Meshach SAMUELS, also known as ("aka") "Meshack Samuels," aka "Meshac Samuels," aka "shootaswish95_," ("SAMUELS"), date of birth April 2, 1997. SAMUELS is described as standing five feet, 6 inches, with black hair and brown eyes and weighing 135 pounds.

The search of SAMUELS shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, folders, and bags that are within SAMUELS' immediate vicinity and control at the location where the search is executed. The search shall not include a strip search or a body cavity search.

## **ATTACHMENT B**

### I. **ITEMS TO BE SEIZED**

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 922(g) (Felon in Possession of a Firearm), 1343 (Wire Fraud), 1344 (Bank Fraud), 1029 (Access Device Fraud), and 1028A (Aggravated Identity Theft) (the "SUBJECT OFFENSES"), namely:

   a.   Firearms or ammunition;

   b.   Credit and debit cards and accounts not in the names of the residents of the residence being searched, including related documents and records such as receipts or invoices;

   c.   Checks and cashier checks not in the names of the residents of the residence being searched;

   d.   Mail matter and shipping packages, opened or unopened, not addressed to or from the residence being searched;

   e.   Personal identifying information of individuals other than those residing at the residence being searched, including social security numbers, other identifying numbers, dates of birth, addresses and telephone numbers, credit, gift, debit card, or other account information, PINs, credit reports, and bank or other financial institution information, and records referring or relating to such information;

   f.   Records, programs, and items relating to the counterfeiting or manipulation of documents and identifications, such as the cutting-and-pasting of signatures, forging or

copying passports, driver's licenses, and other form of identification, identification-proportioned photographs of faces, letterheads, watermarks, and seals, including the altered or counterfeited information itself.

g.   Records relating to wealth and the movement of wealth since 2020 such as crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders, brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $1,000;

h.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

i.   Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched, such as keys, rental agreements, leases, utility bills, identity documents, cancelled mail, and surveillance video;

j.   Currency, money orders, and casino chips with a value in excess of $1,000, including the first $1,000 if more

than $1,000 is found, precious metal coins and bullion, Bitcoin and other digital currency as well as related documents and programs, and prepaid debit or credit cards;

k.   Documents and keys relating to public storage units, rental cars, prepaid cellular telephones, safety deposit boxes, Commercial Mail Receiving Agencies, or receiving mail at someone else's address, or holding or renting assets or items under someone else's name;

l.   Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and ICQ, Telegram, and email addresses.

m.   Documents and records referring or relating to law enforcement or bank investigations, accounts being closed or at risk of being closed, currency transaction reports, and manipulating transaction amounts to avoid scrutiny;

n.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

o.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

p.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Instagram, Snapchat, FaceTime, Skype, WhatsApp and Telegram), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

q.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

        d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        e.   evidence of the times the device was used;

        f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        h.   records of or information about Internet Protocol addresses used by the device;

        i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

5.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

6.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

7.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

8.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

9.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

10.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

11.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

12.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

13.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

14.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

15.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

16.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Meshach Samuels, also known as ("aka") "Meshack Samuels," aka "Meshac Samuels," aka "shootaswish95_," ("SAMUELS")'s thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of SAMUELS' face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

17.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Alfredo Rossi, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of applications for warrants to search the following property and person described more fully in Attachments A-1, A-2, A-3, and A-4, which there is probable cause to believe are currently located in the Central District of California:

a.    The apartment located at The Herald, 150 East Crowther Ave, Unit 508, Placentia, CA 92870, in Orange County, in the Central District of California (the "SUBJECT PREMISES"), currently leased in the name of S.J., and where, as discussed below, SAMUELS is believed to currently reside with S.J., as further described in Attachment A-1;

b.    A 2017 black Mercedes Benz, bearing California license plate number BF07M93, Vehicle Identification Number 4JGED6EB4HA053650, registered to J.S.[1] in Spring Valley, California and ("SUBJECT VEHICLE"), and used by SAMUELS, as further described in Attachment A-2;

c.    The person of Meshach Samuels, aka "Meshac Samuels," aka "shootaswish95_," ("SAMUELS"), as further described in Attachment A-3; and

2.    Two cellular telephones seized on or about August 29, 2021, by the Costa Mesa Police Department ("CMPD") and currently

---

[1] This individual is believed to be S.J. who resides with SAMUELS at the SUBJECT PREMISES.

maintained in the custody of the Homeland Security
Investigations ("HSI") in Long Beach, California: one red Apple
iPhone, IMEI #351183324009439 ("SUBJECT DEVICE 1") and one green
Apple iPhone, IMEI #357463527308877, ("SUBJECT DEVICE 2", and
collectively, the "SUBJECT DEVICES"), both believed to have been
used by SAMUELS prior to seizure, as further described in
Attachment A-4.

3.    The requested search warrants seek authorization to
seize evidence, fruits, and instrumentalities of violations of
18 U.S.C. §§ 371 (Conspiracy), 922(g) (Felon in Possession of a
Firearm), 1343 (Wire Fraud), 1344 (Bank Fraud), 1029 (Access
Device Fraud), and 1028A (Aggravated Identity Theft) (the
"Subject Offenses").

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrants
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## BACKGROUND OF AFFIANT

5.    I am a Special Agent with Homeland Security
Investigations ("HSI") and have been so employed since June
2019.  I am currently assigned to the El Camino Real Financial
Crimes Task Force, where I investigate matters concerning bank

fraud, wire fraud, identity theft, money laundering, and other illegal financial transactions.

6.   Prior to becoming a Special Agent with HSI, I was employed as a Special Agent with the United States Secret Service ("USSS") from June 2016 until June 2019, where I was responsible for the investigation of various types of theft and fraud, including the manufacturing of counterfeit and fraudulent identification documents, and the investigation of financial crimes (such as access device crimes, credit card fraud, check fraud, and schemes to conceal and launder the proceeds of such crimes).

7.   To become an HSI Special Agent, I completed 9 months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  During my employment as an HSI and USSS Special Agent, I have participated in several investigations related to alien smuggling, narcotics smuggling, weapons trafficking, organized criminal activity, child exploitation, and financial crimes. I have participated in various aspects of criminal investigations, including bank records analysis, telephone records analysis, electronic surveillance, physical surveillance, search warrants, arrests, and reviewing evidence from digital devices.  I have also spoken to many law enforcement agents regarding their experience in criminal investigations, interviewed defendants, confidential informants, and witnesses who had personal knowledge regarding the methods used to commit various types of criminal offenses.

8.     Through my experience and training, I have also become familiar with the illicit manner in which firearms are acquired and used by individuals engaged in criminal activity to include financial crimes.  I have become familiar with the efforts of individuals engaged in the importation, smuggling, manufacturing, distribution, and sale of firearms to avoid detection and apprehension by law enforcement officers.

## SUMMARY OF PROBABLE CAUSE

9.     On August 29, 2021, an officer with the CMPD, assigned to the South Coast Plaza Mall Detail, initiated a traffic stop on a black BMW for littering and expired registration. The Officer contacted the driver of the vehicle, Meshack SAMUELS ("SAMUELS") and the passenger of the vehicle, Jolene J.G. ("J.G.").  Upon contact SAMUELS repeatedly provided a false name and date of birth to the officer and gave the officer verbal consent to search his vehicle.

10.     During the search of the vehicle, the officer located blank checks and a credit card in names, other than SAMUELS' or J.G. and a large stack of U.S Currency in the center console. SAMUELS resisted Officers' attempts to place him in handcuffs and conduct a search of his person. Officers ultimately retrieved a black and silver Ruger LCP .380 caliber semi-automatic pistol from SAMUELS' underwear. The firearm was loaded, with a live round in the chamber and three rounds in an inserted magazine.

11.     SAMUELS is a convicted felon with an extensive criminal history to include a conviction for aggravated battery

of a law enforcement officer on August 30, 2016, and possession of a weapon on August 4, 2020.

12.  The SUBJECT PREMISES is the location where SAMUELS lives, based on GPS records from March 2022 for a cellular telephone number used by SAMUELS, law enforcement surveillance of the SUBJECT PREMISES in March 2022, and information provided by the SUBJECT PREMISES' property manager.

13.  Also based on law enforcement surveillance of the SUBJECT PREMISES, as of March 2022, SAMUELS drives the SUBJECT VEHICLE and also rides as a passenger in the SUBJECT VEHICLE.

## STATEMENT OF PROBABLE CAUSE

14.  Based on my review of investigative reports and notes, bank statements, witness statements, my discussions with other law enforcement officers working on this investigation, and other evidence, I learned the following information:

**A.   CMPD Officer Performs a Traffic Stop of a Black BMW**

15.  On August 29, 2021, at approximately 3:24 p.m., an officer with the CMPD, assigned to patrol the South Coast Plaza Mall, initiated a traffic stop on a black BMW for littering and expired registration.  The officer had also observed SAMUELS throw a large orange Louis Vuitton bag on the ground.  The Officer contacted the driver of the vehicle, later identified as Meshach Samuels ("SAMUELS") and the passenger of the vehicle, later identified as J.G.  Upon contact SAMUELS repeatedly provided a false name and date of birth to the officer, and appeared to have photographs of multiple identification cards on his phone.  SAMUELS was also reaching his hands down and moving

around, and so was relocated to the curb, uncuffed, for officer
safety.  Finally, SAMUELS admitted to providing a false name,
provided his real name and gave the officer verbal consent to
search his vehicle.  Consent was recorded via the officer's
department issued body worn video camera.  J.G. was also
relocated to the curb, uncuffed.

**B.   Items Evidencing Check and Credit Card Fraud Found in
SAMUELS' Vehicle**

16.  During the search of the vehicle, the officer located
blank checks in names other than SAMUELS or J.G., including six
checks that were blank except for a signature, checks with an
address in San Diego, checks issued by Well Fargo in Florida,
New Jersey and California, two filled-out check in names other
than SAMUELS or J.G., a moneygram in names other than SAMUELS or
J.G., and a cashiers check with a remitter name other than
SAMUELS or J.G.  There was also a Citibank credit card in a name
other than SAMUELS or J.G., and a large stack of U.S Currency in
the center console.  SAMUELS denied ownership or knowledge of
the checks or Citibank card in the vehicle, but said the cash
belonged to him.

**C.   Loaded Firearm Found Concealed On SAMUELS**

17.  SAMUELS was arrested and resisted Officers' attempts
to conduct a search of his person.  During the pat-down search,
officers found and recovered a black and silver Ruger LCP .380
caliber semi-automatic pistol bearing serial number 374-81336,
from SAMUELS' underwear.  The firearm was loaded with four

rounds of .380 Auto S&P ammunition: a live round in the chamber and three rounds in an inserted magazine.

18.   Following SAMUELS arrest, two phones were seized that are believed to belong to SAMUELS.  One was an iPhone that was being used by SAMUELS while he interacted with the officer during the traffic stop, and the officer observed photographs of multiple identification cards on that phone.  The officer placed that phone on the driver seat when he asked SAMUELS to step out of the BMW, and that phone was later recovered from the driver's seat.  The other iPhone was also recovered from the BMW, in the proximity of the driver's seat ("SUBJECT DEVICE 1" and "SUBJECT DEVICE 2," collectively, "SUBJECT DEVICES").

**D.   Criminal History**

19.   I reviewed SAMUELS' criminal history records and learned that SAMUELS has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about August 30, 2016, a first-degree felony violation of Florida Statutes Sections 784.07(2)(d): Aggravated Battery on a Law Enforcement Officer, 782.065: Attempted Murder of a Law Enforcement Officer, 777.04: Attempt, 775.0823: Violent Offense Committed Against Law Enforcement Officer, and 775.087: Aggravated Battery; and a third-degree felony violation of Florida Statutes Section 316.1935(1): Fleeing or Attempting to Elude a Law Enforcement Officer, in the Miami-Dade County Court, Case Number F15-007045.

b.   On or about August 4, 2020, a second-degree violation of Florida Statutes Section 790.23(1): Possession of a Firearm, Weapon or Ammunition by a Convicted Felon in the Miami-Dade County Court, Case Number F20-004582.

**E.   Interstate Nexus of Firearm**

20.   On or about February 8, 2021, a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Firearms Interstate Nexus Expert examined a photograph of the handgun seized from SAMUELS and confirmed that the handgun was manufactured outside of the State of California.  Because the handgun was found in California, I believe that it traveled in and affected interstate and/or foreign commerce.

**F.   SAMUELS Continues to Possess Firearms On Social Media**

21.   Local law enforcement agencies in New York and Florida brought SAMUELS' Instagram profile to my attention, registered under the username "shootaswish95_" (the "Instagram Account"), and informed me that they have been monitoring and preserving SAMUELS' public social media posts on the Instagram Account dating back to approximately March 2021, in conjunction with their broader investigation into SAMUELS' ongoing criminal activity.[2]

22.   I have reviewed the public posts preserved by New York and Florida law enforcement as well as additional public posts on that account.  I recognized SAMUELS in many of the photos

_____

[2] In addition, a state warrant on the Instagram Account was signed by the Honorable Judge John Ziny of the Superior Court of California, Orange County, on October 26, 2021.  The government relies solely on public posts in this application and is not relying on any returns from that warrant herein.

posted to the Instagram Account from my review of SAMUELS' DMV and booking photos, as well as body camera footage from the August 29, 2021 arrest.

23.   On the Instagram Account, numerous public posts, including posts after SAMUELS' August 29, 2021 arrest, show SAMUELS exhibiting a semiautomatic pistol.  Specifically, least three of these photos show SAMUELS with a semiautomatic pistol either in his hand, in the background of the photo, or tucked in his waistband.

24.   For example, on or about October 14, 2021, and October 16, 2021, SAMUELS posted the following photos to his Instagram Account where he was in possession of a tan and black firearm:



25.  On or about October 24, 2021, SAMUELS posted a photo to the Instagram Account of what looked to be the same firearm from his previous post in his possession:



26.  In a photo posted by SAMUELS to the Instagram Account on or about November 11, 2021, SAMUELS appears to be posing with large amounts of cash while wearing two semiautomatic pistols tucked in his pockets, and the one in his right pocket appears to be tan and black:



10

27.   On or about February 10, 2022, SAMUELS posted the following photo, showing a firearm:



28.   On or about February 11, 2022 SAMUELS posted a photo in which he is posing in front of a mirror with two semi-automatic pistols protruding from both front jeans pockets. This picture is captioned by the comment "Lol I just wake up n put it on!":



29.   Based on my review of these photos, I believe that SAMUELS continues to illegally possess firearms.

### G.   SAMUELS' History of Engaging in Financial Fraud and Evidence that He is Continuing to Do So

30.   I have learned the following regarding SAMUELS' criminal history from New York and Florida law enforcement agencies: when SAMUELS was arrested at a hotel in 2015 in connection with his eventual 2015 conviction referenced in paragraph 14(a), fraudulent credit cards and identification were found in the hotel room; and in conjunction with his 2020 arrest, SAMUELS led the police on a high-speed chase in a Mercedes-Benz C300 and was involved in a number of crashes, before ultimately running a red light and striking another vehicle, leaving the car inoperable, and after SAMUELS fled the scene, a search of the vehicle revealed blank checks and other forgery instruments inside.

31.   As mentioned above in paragraph 11, checks and cards not in SAMUELS' name were found in the car he was driving on the day of his August 29, 2021 arrest.

32.   On the Instagram Account, in numerous public posts, including from after SAMUELS' August 29, 2021 arrest, SAMUELS invites his Instagram followers to join a Telegram chat group for a fee named "WINNING OUR ONLY OPTION", that will teach them how to make quick money off of banks.

33.   For example, on or about June 30, 2021, SAMUELS posted that the entry fee to the chat group had gone up from $500 to $800 to $1,000:



34.   On or about February 11, 2021, SAMUELS posted that all he needed to collaborate is a Wells Fargo or Citibank account:



13

35.  On or about February 15, 2022, SAMUELS publicly posted to his Instagram Account a screenshot from his telegram chat and said people should contact him regarding the entry fee showing an entry fee for a chat.  In the background appear to be images of receipts related to the suspected bank fraud scheme:



36.  On or about March 9, 2022, SAMUELS posted a screenshot of a redacted Wells Fargo receipt listing a $15,000.00 check deposit as follows:



**H.   Identification of the SUBJECT PREMISES as SAMUELS' Residence and Identification of the SUBJECT VEHICLE as a Car that SAMUELS Uses**

37.  On March 1, 2022, the Honorable Steven Kim, United States Magistrate Judge, issued a warrant in case number 2:22-MJ-00836, for historical cell-site information, prospective cell-site and GPS information, and use of a cell-site simulation for a cellular telephone number provided by SAMUELS to a Chanel retail store as part of a customer profile used during a transaction on or about February 19, 2022.

38.  Based on my review of information obtained pursuant to that warrant, I am aware that between March 2, 2022, the date I first received information pursuant to the warrant, and March 19, 2022, a luxury apartment complex known as "the Herald" which

is located at 150 E. Crowther Ave. Placentia, California was
regularly within the radius of uncertainty of SAMUELS' telephone
between the hours of 11:30 p.m. and 11:30 a.m.

39.   On March 18, 2022, based on the cell-site information,
agents performed surveillance in the vicinity of "The Herald".
During the period of surveillance, I spoke with the Senior
Property Director of The Herald, J.M., who recognized an
Instagram photo of SAMUELS and stated that SAMUELS lived at the
property in Unit 508 ("SUBJECT PREMISES") with a female from San
Diego (later identified as S.J.).  The information about
SAMUELS' residing with a female from San Diego is consistent
with prior posts on SAMUELS' personal Instagram account about
being in San Diego with a female.

40.   J.M. also told me that the SUBJECT PREMISES Building
requires key cards/key fobs to access common doors, elevators
and individual apartment units, and that each usage of the key
card/fob is logged.  The SUBJECT PREMISES Building and
surrounding property have security cameras throughout the
property.

41.   J.M. searched for the last time that a keycard was
used on Unit 508, which was on or about March 17, 2022.  J.M.
pulled a security footage from the parking structure on the
fifth floor for that timeframe, which showed a Black Mercedes
Benz SUV (the "SUBJECT VEHICLE") parking.  SAMUELS then exits
the passenger seat of the vehicle, followed by an unidentified
male with dreadlocks exiting the driver seat and a female (later

identified as S.J.) exiting the rear passenger seat of the vehicle.

42.   On March 18, 2022, I walked to the parking structure of the apartment complex and found the SUBJECT VEHICLE parked in the same location observed in the surveillance video.

43.   A search of the SUBJECT VEHICLE in California Department of Motor Vehicle ("CA DMV") databases showed that it is registered to S.J.  I reviewed the photo of S.J. from CA DMV databases and recognized her as the same female in the security video footage from March 17, 2022.

44.   I also recognized S.J. as the same female tagged by SAMUELS in an Instagram post from 2021.  In that post, S.J. is posing in front of a mirror holding a large stack of cash.

45.   At approximately 12:35 p.m. on March 18, 2022, I surveilled SAMUELS leaving the parking structure while driving the SUBJECT VEHICLE accompanied by the same unidentified male passenger with dreadlocks observed in the March 17, 2022, security video footage.

46.   On or about March 22, 2022, I reviewed the leasing application for the SUBJECT PREMISES and learned that it was leased by S.J. on or about December 11, 2021.  Additionally, S.J. submitted a copy of her California Driver license with the leasing packet, which I recognized as the same photograph observed in CA DMV databases for S.J.

## TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

47.   From my training, personal experience, and the collective experiences related to me by other law enforcement

officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence or vehicles, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.   Persons who possess, purchase, or sell firearms often keep their firearms in their residence or vehicles, or in places that are readily accessible, and under their physical control.

c.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

d.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between

persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

**TRAINING AND EXPERIENCE REGARDING FINANCIAL OFFENSES**

48.  Based on my experience and training, and based on my consultation with other law enforcement officers, I know that:

c.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital

devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices

     d.   Oftentimes identity thieves take pictures of stolen items with their cellphones.

     e.   It is also common for identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

     f.   Individuals involved in fraud schemes like this one usually keep evidence of their schemes, such as pay-owe sheets for dividing the proceeds, contact information for their co-conspirators, and records documenting the scheme so when an error is made, they can recreate the documentation needed to help conceal the fraud.

     g.   Individuals specialized in the fraudulent negotiation of stolen, altered, or counterfeit checks, will

20

often maintain a collection of pay stubs corresponding to checks already negotiated at a financial institution, as well as a collection of checks yet to be deposited. These checks are usually drawn off accounts in the name of individuals other than the perpetrator and can be fraudulently endorsed by the fraudster through forgery.

h.   These individuals often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.

i.   Based on my training and experience in the field of financial crimes investigations, I also know that it is common for fraudsters to exploit the Federal CARES Act, meant to bring financial relief for individuals and entities affected by COVID-19.  Fraudsters know that money is often expediently dispensed and with little oversight.

j.   Based on your affiant's training and experience in the field of fraud and identity theft investigations, your affiant knows it is common for identity thieves to employ multiple collusive parties to visit multiple Automated Teller Machines ("ATMs") on their behalf.  This adds an additional layer of anonymity to their scheme and helps to avoid detection and identification via video surveillance.

k.   Individuals involved in fraud schemes need to communicate with their co-conspirators about their fraudulent activity.  There are usually records of those communications in their electronic devices such as cellular telephones.

l.   Typically, they maintain the evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles.  Such individuals commonly use digital devices to communicate with their fellow participants by phone, email, text messages and messaging apps.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation.

m.   I know from training and experience that individuals involved in fraud keep the most damaging evidence and/or proceeds of the scheme at their residences, vehicles, garages.  Proceeds such as cash and gifts are frequently concealed at the fraudster's residence.  More sophisticated or cagey criminals may rent public storage units to use to further distance themselves from incriminating evidence, or safety deposit boxes, especially when storing valuables such as cash.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

49.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[3] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such file's months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are

---

processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices,
which may take substantial time, particularly as to the
categories of electronic evidence referenced above.  Also,
there are now so many types of digital devices and programs
that it is difficult to bring to a search site all of the
specialized manuals, equipment, and personnel that may be
required.

b.    Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

51.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

   c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SAMUELS' thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of SAMUELS' face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

52.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

53.   For all the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 922(g) (Felon in Possession of a Firearm), 1343 (Wire Fraud), 1344 (Bank Fraud), 1029 (Access Device Fraud), and 1028A (Aggravated Identity Theft), will be found in a search of the locations described in Attachments A-1, A-2, A-3, and A-4.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 22nd day of
March, 2022.


_____
HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

27